# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION AT CINCINNATI

UGBE OJILE,

                Petitioner,           :     Case No. 1:13-cv-844

     - vs -                           District Judge Michael R. Barrett
                                     Magistrate Judge Michael R. Merz

MICK R. OPPY, WARDEN,
 Correctional Reception Center,
                                :
              Respondent.

# REPORT AND RECOMMENDATIONS

This habeas corpus case was brought *pro se* by Petitioner Ugbe Ojile to obtain relief from his conviction at a bench trial in the Common Pleas Court of Hamilton County, Ohio, on various robbery related charges and the consequent twenty-five year sentence.  He pleads the following grounds for relief:

      **Ground One:**   Ojile's convictions are based on insufficient evidence.

      **Supporting Facts:**  Ojile was convicted on all counts when the evidence was insufficient as a matter of law to sustain the conviction.

      **Ground Two:**  Ineffective assistance of counsel

      **Supporting Facts:**

      A) Failure of trial counsel to secure the testimony of Ojile's alibi witness to explain documented flight records she sent in which would have verified Ojile's alibi information.

      B) Failure of trial counsel to introduce evidence in his possession marked "for counsel only" that proved it was physically impossible

1

for Ojile to have committed the robbery on Danielle Duncan on Counts 12 of B1007149.

C) Failure of trial counsel to suppress statements Ojile allegedly made to "jailhouse informant"', Tyrone Tanks, that was obtained in violation of Ojile's 6th Amendment right to counsel.

**Ground Three:**  Due process violation in use of impermissible suggestive identification procedure.

**Supporting Facts:**  Prosecutor presented single photograph of defendants to victim two weeks before trial stating "These are the guys up for trial". Prior to that, there was no prior line-up presented to victim.

Prosecutors action represented state action, and the resulting in-court identification during trial via tele-video hook-up (while Ojile and Erkins were in handcuffs and the only the black males in the entire room), became the sole evidence used to convict Ojile on Count 11 of B1007149 with absolutely no other supporting or corroborating evidence.

**Ground Four:**  Due process violation when prosecutor withheld evidence that formed the basis of state's case (*Brady* violation).

**Supporting Facts:**  Prosecutor secretly showed single photograph of defendant to victim two weeks before trial stating, "These are the guys up for trial" and failed to notify and hand over those pictures to defense counsel. This action denied defendants an opportunity to file a motion to suppress that identification which would have been successful based on prosecutor's prior actions. The resulting in-court identification was the sole evidence used to convict Ojile on Count 11 of B1007149, with no supporting evidence.

**Ground Five:**  Ojile's due process rights as guaranteed by the Fifth and Fourteenth Amendments of the United States Constitution was [sic] violated by prosecutor's knowing use of perjured testimony.

**Supporting Facts:**  Prosecutor knowingly introduced perjured testimony, failed to correct the testimony, and relied on this testimony in closing arguments to gain a conviction. Prosecutor introduced testimony from two key witnesses, Amy Hoover and Tyrone Tanks, to place Ojile at three different robberies when information was verified to the state by the FBI, that shows Ojile

2

was in jail in Illinois when two of the robbery's [sic] occurred, and information was verified on the third robbery from an affidavit from the custodian of records for Continental Airlines that proved he was not in Ohio, and it was physically impossible for Ojile to have committed the robbery.

**Ground Six**: Ojile's due process rights as guaranteed by the Fifth and **Fourteenth** Amendments of the United States Constitution was [sic] violated when Ojile was convicted and sentenced to a crime that he was never charged with (count 26 of B-1007149C).

**Supporting Facts:** Ojile was denied his due process of law in violation of the 5th and 14th Amendments to the United States Constitution when he was convicted on a "Conspiracy to commit aggravated robbery", but was indicted for Aggravated Robbery on Counts 26 of B1007149.

**Ground Seven:** Ojile was denied his Sixth Amendment right to confrontation.

**Supporting Facts:** Ojile was denied his right to Confrontation guaranteed by the 6th Amendment, when officer Gregory Morgan who allegedly recovered incriminating evidence from a search of residence did not testify at trial; and upon defense objection officer Bill Crock who didn't personally observe the recovery of these items was allowed to introduce items into evidence; and then that evidence was the sole evidence used to convict Ojile with no other supporting or corroborating evidence.

**Ground Eight:** Ojile was denied his Sixth Amendment right to counsel.

**Supporting Facts:** Ojile's Sixth Amendment Right to Counsel was violated when the state intentionally placed him in the same cell as jailhouse informant Tyrone Tanks, for Tanks to deliberately elicit incriminating information after Ojile was already indicted on charges, knowing that Tanks would be testifying for the state at Ojile's trial, and Tanks testifies as a key witness in the state's case in chief.

**Ground Nine:** Ojile was denied of [sic] his Sixth Amendment right to a fast and speedy trial.

**Supporting Facts:** Ojile was denied his 6th and 14th Amendment Right to a Fast & Speedy Trial when the court *sua sponte* ordered a fifty-five day continuance to rule on a pre-trial motion by Ojile that

3

was never filed, and nothing in the record indicates that the court was considering any motion that formed the basis of this continuance, and then the court uses this continuance as its reason to justify bringing Ojile to trial after the expiration of time as mandated by the Speedy Trial Statute.

**Ground Ten:** Ojile was denied effective assistance of counsel on his direct appeal.

**Supporting Facts:** Ojile was denied effective assistance of appellate counsel for appellate counsel failing to raise Grounds One (Insufficient Evidence on Counts 1, 11, 12 & 14 of B1007149), Grounds Two (A), Grounds Four, Grounds Eight, and Grounds Nine of this Habeas Petition in Ojile's appeal of right on direct appeal.

(Petition, Doc. No. 1.)

## Procedural History

Ojile was indicted in 2010 with Kenyatta Erkins and Amy Hoover for conducting a scheme in which gamblers at two Indiana casinos were targeted for robbery.  Ojile waived trial by jury and was tried to the bench in May and June, 2011.  Direct appeal was taken with new counsel to the First District Court of Appeals which affirmed in part and reversed in part.  *State v. Ojile*, 2012-Ohio-6015, 2012 Ohio App. LEXIS 5223 (1ˢᵗ Dist. Dec. 21, 2012).  The Supreme Court of Ohio declined jurisdiction over an appeal.  *State v. Ojile*, 135 Ohio St. 3d 1414 (2013).

On February 25, 2013, Ojile filed an Application to Reopen the Appeal under Ohio R. App. P. 26(B).  The First District summarily overruled the Application on April 17, 2013 (Return of Writ, Doc. No. 13-2, PageID 595).[1]  The Ohio Supreme Court again declined jurisdiction.  *Id.*

---

[1] When any document is filed with this Court, the Court's electronic filing system affixes a unique Page Identification Number in the upper right hand corner of every page.  The attention of the parties is directed to this Magistrate Judge's Standing Order of May 8, 2014, which provides in pertinent part "All references to the record in this Court must be to the filed document by title, docket number, and PageID reference.  (E.g., Defendant's Motion

at PageID 644.

On June 1, 2012, Ojile filed a Motion for Post-conviction Relief under Ohio Revised Code § 2953.21. *Id.* at PageID 666 et seq. Trial Judge Nadine Allen denied the petition. *Id.* at PageID 803 et seq. The First District affirmed. *Id.* at PageID 843, et seq. The Ohio Supreme Court again declined jurisdiction on November 6, 2013, and Ojile filed his Petition in the instant case on November 12, 2013 (Doc. No. 1). The case became ripe for decision on August 13, 2014, when Magistrate Judge Litkovitz denied Ojile's Motion to Supplement the Record (Doc. No. 17). The reference in the case was transferred to the undersigned on November 21, 2014 (Doc. No. 18).

The First District Court of Appeals found the relevant background facts of the offenses in suit as follows:

### I. The Investigation

 **[P2]** The record shows that the Cincinnati Police Department and other local police agencies had received a number of reports from local residents who had been followed home and robbed after gambling at the Hollywood (formerly Argosy) and Grand Victoria Casinos in Lawrenceburg, Indiana. The various police agencies formed a task force to apprehend the perpetrators. After many hours of viewing surveillance video from the casinos, police focused their attention on Ojile and codefendant Kenyatta Erkins. Police officers eventually obtained a warrant to put a GPS tracking device on a dark green Dodge Magnum that Erkins frequently drove. They also obtained a warrant to record the cell phone conversations between Erkins and Ojile.

 **[P3]** Police discovered that Erkins and Ojile used the same method of operation in each case. Erkins would go into the casino and look for victims who were carrying large amounts of cash, and who he and Ojile believed would be easy targets. They often targeted gamblers who appeared to be Asian because they believed

---

to Dismiss, Doc. No. 27, PageID ___.) The large majority of cases before this Magistrate Judge are habeas corpus cases with large state court records and correct citation to the record is critical to judicial economy. Therefore, nonconforming filings will be stricken.

those individuals would be less likely to call the police. Ojile would wait in a car outside the casino because he had been banned from entering the Hollywood. Erkins would call Ojile and discuss specific "targets." They would wait for the "targets" to leave and follow them home. When the victim got out of his or her car, they would approach the victim at gunpoint and steal the victim's money and other valuables. Erkins's girlfriend, Amy Hoover, also participated in a few of the robberies.

**[P4]** On October 7, 2010, police officer Kyle Ingram was working undercover in the Hollywood Casino, posing as an elderly gambler. He walked around slowly with a cane, and when he saw Erkins walking past him, he pulled a large amount of cash out of his pocket and started to count it. Erkins saw him and called Ojile to report that he had a "target."

**[P5]** When Ingram left the casino, Erkins followed him to the parking lot. Ingram got into his van and left. Erkins got in the Dodge Magnum with Ojile and followed Ingram's van. Ingram left the highway on a predetermined exit and pulled into a gas station. The Magnum pulled into the parking lot of a nearby Waffle House. Police surrounded the car and arrested Erkins and Ojile.

**[P6]** Police searched the Magnum and found a backpack that contained a .40-caliber Glock handgun, a live round of ammunition, and a BB gun. They also found three cell phones, a black hooded sweatshirt, camouflage gloves, Ojile's personal papers, and papers belonging to one of the robbery victims. In the trunk, they found duct tape that had been used to tie up one of the robbery victims.

**[P7]** Police also executed a search warrant at the apartment where Ojile and his girlfriend, Nikki Williams, lived. They found a .40-caliber Glock Magnum handgun with a magazine containing 11 rounds of ammunition, as well as additional .40-caliber ammunition. They also found a driver's license, a bank card and a social security card belonging to one of the robbery victims.

## II. The Robberies

### A. Michael Weisbrod

**[P8]** On February 9, 2009, Michael Weisbrod, a professional poker player, went to what was then the Argosy Casino and won over $8,000. Surveillance tapes from the casino showed that Erkins was following Weisbrod that night. Weisbrod drove home to his

apartment in Oakley, arriving after 1:00 a.m. Shortly after he arrived home, a young woman knocked on his door and asked him if anyone was living in the apartment downstairs. Without opening the door, Weisbrod told her "no," and she left.

**[P9]** The following night, something similar occurred. After hearing a knock on his door, Weisbrod looked through the peephole and saw a man at the door. The man asked if anyone was living in the downstairs apartment. Weisbrod said "no," and the man walked away. Weisbrod watched him until he was out of sight.

**[P10]** Shortly after 9:00 p.m. the next night, February 11, 2009, Weisbrod was home alone when all the lights in the room suddenly went off. Because his neighbors still had electricity, Weisbrod went to the basement of his apartment building to look for the circuit breaker, using the light from his cell phone to see.

**[P11]** As Weisbrod neared the circuit breaker, someone yelled for him to get down on the ground, which he did. He was then attacked by what he believed to be two people, a male and a female. They informed him that they had a gun. They proceeded to tie his hands and legs with duct tape, and ordered him to tell them where the money was. Weisbrod told them that it was in his dresser.

**[P12]** The woman went upstairs. When she returned, she said that the money was not there. The attackers threatened Weisbrod and poked him in the back of the head with the gun. Weisbrod clarified that the money was in the nightstand next to his bed. The woman went back upstairs and retrieved the money. After threatening Weisbrod again, the attackers left.

**[P13]** Weisbrod freed himself and asked his neighbors to call the police. The robbers stole between $8,000 and $9,000 in cash, and Weisbrod's cell phone, wallet and car keys. He could not identify the robbers at the time, although Hoover later testified that she was the woman who had knocked on his door and who had retrieved the money during the robbery.

**[P14]** On April 3, 2009, Weisbrod won over $8,000 at the Hollywood Casino. He left after midnight and made sure that no one followed him. When he turned into the driveway leading to his apartment, he noticed that one of the motion-activated lights was on, which caused him concern. Nevertheless, he drove around to the back of his apartment building and got out of his car.

**[P15]** When he was trying to get in the door of his apartment, two African-American men approached him. He described them as being of medium build and wearing hoods and jeans. They pulled out a gun, threatened him, and ordered him to get on the ground. They reached into his pockets and took his wallet and cash. They then fled from the scene in a white SUV.

**[P16]** The area was well-lit and Weisbrod was able to get a good look at his attackers. He told the investigating officer that if he saw the men again, he could identify them. Six months later, Weisbrod saw television news stories about the arrest of Erkins, Ojile and Hoover. He identified Erkins and Ojile as the men who had robbed him the second time. He recognized Hoover as the women [sic] who had knocked on his door before the earlier robbery. Ojile told details about the first robbery of Weisbrod to Tyrone Tanks, another inmate at the Hamilton County Justice Center.

**B. Davis Nguyen**

**[P17]** On May 29, 2009, Davis Nguyen went to the Hollywood Casino and won approximately $2,000 playing roulette. He left the casino between 3:00 and 4:00 a.m. When he arrived at his home in Delhi, he was sitting in his car talking on his cell phone when he saw an African-American man behind a bush. Nguyen got out of his car and walked over to where the man was standing. The man walked away.

**[P18]** Nguyen followed the man, who pulled out a gun and ordered Nguyen to return to his car. The man ordered Nguyen to lie down on the floor of the car and then stole Nguyen's roulette winnings, cell phone and wallet. Nguyen's wallet contained his driver's license, social security card, and bank card. The attacker fled in a white SUV.

**[P19]** When Ojile was arrested, the police seized Ojile's wallet. Inside, they found a business card with Nguyen's name, date of birth, address and social security number handwritten on the back.

**[P20]** At trial, Nguyen testified that he was 90 percent sure that Ojile was his attacker. Further, Tanks testified that Ojile had told him that he had been driving a Ford Escalade during one of the robberies, and that Ojile feared that the victim of that robbery could identify it.

**C. Daniel Duncan**

**[P21]**  Daniel Duncan was a professional gambler who played poker frequently. He had seen Ojile and Erkins at another casino in Indiana on a number of occasions. He had also seen Erkins at the Hollywood Casino a number of times. He testified that sometimes Erkins played and sometimes he watched, and that it was not unusual to see Erkins on the phone when he was watching.

**[P22]**  On April 18, 2010, Duncan was at the Hollywood playing poker. He cashed out his chips and left to drive to his apartment in Oakley. He had been robbed before, and was carrying .40-caliber Glock in his back pocket. He also carried Smith and Wesson ammunition. But Duncan was angry because he had lost a substantial sum of money that night, and he was not paying attention to see if anyone was following him when he left the casino.

**[P23]**  When he arrived at his apartment, he parked in one of the open parking spaces. As soon as he opened his car door, a person he described as a six foot African-American male wearing a black "hoody," black pants and a black bandana across his face, pointed a gun at his head. Duncan stumbled and his gun slid out of his pocket. Duncan's attacker patted him down and ordered him to empty his pockets. The attacker stole Duncan's gun, as well as approximately $1,250 and several other items.

**[P24]**  When Ojile was arrested, the police searched a backpack that was located between his legs. Inside the backpack, they found Duncan's .40-caliber Glock and his Smith and Wesson ammunition. Ojile had admitted to Tanks that he had been involved in a robbery where the victim had stumbled and the victim's gun had slid out of the victim's pocket, and that he had stolen that gun.

**D. Tien Dao**

**[P25]**  On June 28, 2010, Tien Dao, a native of Vietnam, played poker at the Hollywood Casino. He left with $1,500, and drove to his home in Colerain Township. He pulled into his driveway at about 2:00 a.m. Even though he could not get into his garage because a car was blocking his path, he opened his garage door using his remote garage-door opener. It was raining, so he waited a few minutes and then quickly ran toward his garage.

**[P26]**  When Dao got into the garage, a man wearing a black shirt and mask and brandishing a gun tried to grab him. A second man,

9

also wearing a mask and brandishing a gun, arrived. Dao tried to get inside of his house, but one of the men hit him in the head twice with the gun. Dao still managed to get inside of his house, but both of his attackers followed him inside. They took Dao's wallet and fled. Dao had his social security card, two California driver's licenses and credit cards in his wallet.

**[P27]** After Ojile's arrest, the police searched his apartment. During that search, they found Dao's two California driver's licenses, his social security card, and his credit card. Additionally, video surveillance tapes showed Erkins following Dao as he left the casino on June 28.

### E. Alan Boogher

**[P28]** On September 7, 2010, Alan Boogher was playing craps at the Grand Victoria Casino while his wife stood by him. He had had a successful night, and surveillance tape showed him collecting substantial winnings at the cash payout window. He and his wife left the casino shortly after midnight.

**[P29]** Surveillance tapes showed Ojile, who was not banned from the Grand Victoria, in the area where Boogher was gambling. When Boogher and his wife got into their car to leave the casino, Ojile got into a black Volkswagen Jetta owned by Nikki Williams, Ojile's girlfriend, and followed Boogher's car. Erkins, driving the Dodge Magnum, also followed them.

**[P30]** Boogher and his wife live near Dayton, Ohio. On their way home, they stopped at a rest area. The Magnum and the Jetta also pulled into the rest area near them. The Booghers switched drivers, and then left the rest area without using the facilities. Ojile and Erkins followed them a short distance, but then turned around and headed south toward Cincinnati.

### F. Sun Xinyu

**[P31]** On September 8, 2010, the police observed Ojile's car leaving the Hollywood Casino and following a white Lexus driven by Sun Xinyu. Police officers observed Ojile as he followed Xinyu's vehicle to Xinyu's apartment in Clifton. Xinyu drove into the parking lot of the apartment complex. While Ojile was looking for a parking spot, Xinyu and his female companion got out of their car and went into their apartment. The police officers followed Ojile as he left and went home.

### G. Lawrence Adams

**[P32]** On September 15, 2010, police officers saw Ojile driving the Volkswagen Jetta as he followed Lawrence Adams from the Hollywood Casino. Ojile followed Adams to Kellogg Avenue in Anderson Township where a uniformed police officer was waiting. The police officer stopped Adams's car under the guise of a traffic stop to prevent another robbery. Nevertheless, the Jetta continued to circle the area during the traffic stop. Because Ojile was still in the area, police officers followed Adams to his home to prevent him from being robbed. Video surveillance tapes showed Ojile following Adams as he left the casino.

### H. Kiran Racherla

**[P33]** Kiran Racherla went with a friend to the Hollywood Casino to play blackjack. He won approximately $100. He and his friend left the casino at 5:00 a.m. on October 3, 2010, and drove to Racherla's apartment complex in Blue Ash.

**[P34]** After Racherla parked his car, he became alarmed at the sight of a man who had emerged from behind a tree. He woke his friend, who had been sleeping, and the two of them got out of the car. Racherla attempted to call 911 from his cell phone. His friend attempted to open the apartment door, but was having trouble, so he fled, leaving Racherla alone.

**[P35]** At that point, an African-American male, wearing a dark mask and hood and brandishing a gun, ordered Racherla to sit on his knees. Racherla refused, and told his attacker that the police were coming. Upon hearing a siren, Racherla tried to flee but the attacker struck him three times with the gun and threatened to shoot him. The attacker put his hand in Racherla's left pants pocket, pulled out his cell phone headset, threw it on the ground, and fled.

**[P36]** The Blue Ash police arrived, and paramedics took Racherla to the hospital. He had large a gash in his head that required staples to close. Again, surveillance tapes showed Erkins following Racherla as he left the casino that night. The police also had cell phone records showing that Ojile's cell phone was in the Blue Ash area the night of the attack. Additionally, when Erkins and Ojile were arrested, police recovered from their car a gun that had been stolen from Daniel Duncan, another robbery victim. Racherla's DNA was found on that gun.

### I. Michael Li and Tony Quach

[P37]  On October 6, 2010, Michael Li and Tony Quach, both
residents of Columbus, Ohio, left the Hollywood Casino at
approximately 10:00 p.m. The police had already arrived at the
casino and had set up surveillance. They were also monitoring the
cell phone conversations between Erkins and Ojile. From those
conversations, the police officers determined that Li and Quach
were the intended "targets." Li and Quach left the casino parking
lot in a black Lexus. Erkins and Ojile followed them in the Dodge
Magnum onto Interstate 275. The police stopped Li's and Quach's
car under the pretense of a traffic stop to prevent them from being
robbed. When the stop was made, the police officers saw Ojile
slam his fist on the steering wheel, seemingly in frustration.

*State v. Ojile*, 2012-Ohio-6015, 2012 Ohio App. LEXIS 5223 (1st Dist. Dec. 21, 2012).

# Analysis

### Ground One:  Convictions Based on Insufficient Evidence

In his First Ground for Relief, Ojile asserts that insufficient evidence was presented at

trial to convict him on Counts 2 and 3 in Case No. B-1006797 and Counts 1, 11, 12, 14, 15, 16,

22, 23, 25, 26, 28, and 29 in Case No. B-1007149 (Memorandum in Support of Petition, Doc.

No. 5, PageID 41-60).

An allegation that a verdict was entered upon insufficient evidence states a claim under

the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

*Jackson v. Virginia*, 443 U.S. 307 (1979); *In re Winship*, 397 U.S. 358 (1970); *Johnson v. Coyle*,

200 F.3d 987, 991 (6th Cir. 2000); *Bagby v. Sowders,* 894 F.2d 792, 794 (6th Cir. 1990)(en banc).

In order for a conviction to be constitutionally sound, every element of the crime must be proved

beyond a reasonable doubt.  *In re Winship*, 397 U.S. at 364.

> [T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt . . . .  This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence and to draw reasonable inferences from basic facts to ultimate facts.

*Jackson*, 443 U.S. at 319; *United States v. Paige,* 470 F.3d 603, 608 (6th Cir. 2006); *United States v. Somerset*, 2007 U.S. Dist. LEXIS 76699 (S.D. Ohio 2007).  This rule was recognized in Ohio law at *State v. Jenks*, 61 Ohio St. 3d 259 (1991).  Of course, it is state law which determines the elements of offenses; but once the state has adopted the elements, it must then prove each of them beyond a reasonable doubt.  *In re Winship, supra.*

In cases such as Petitioner's challenging the sufficiency of the evidence and filed after enactment of the Antiterrorism and Effective Death Penalty Act of 1996 (Pub. L. No 104-132, 110 Stat. 1214)(the "AEDPA"), two levels of deference to state decisions are required:

> In an appeal from a denial of habeas relief, in which a petitioner challenges the constitutional sufficiency of the evidence used to convict him, we are thus bound by two layers of deference to groups who might view facts differently than we would. First, as in all sufficiency-of-the-evidence challenges, we must determine whether, viewing the trial testimony and exhibits in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. See *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979). In doing so, we do not reweigh the evidence, re-evaluate the credibility of witnesses, or substitute our judgment for that of the jury. See *United States v. Hilliard*, 11 F.3d 618, 620 (6th Cir. 1993). Thus, even though we might have not voted to convict a defendant had we participated in jury deliberations, we must uphold the jury verdict if any rational trier of fact could have found the defendant guilty after resolving all disputes in favor of the prosecution. Second, even were we to conclude that a rational trier of fact could not have found a petitioner guilty beyond a reasonable doubt, on habeas review, we must still defer to the state appellate court's sufficiency

determination as long as it is not unreasonable. See 28 U.S.C. § 2254(d)(2).

*Brown v. Konteh*, 567 F.3d 191, 205 (6th Cir. 2009).  In a sufficiency of the evidence habeas corpus case, deference should be given to the trier-of-fact's verdict under *Jackson v. Virginia* and then to the appellate court's consideration of that verdict, as commanded by AEDPA. *Tucker v. Palmer*, 541 F.3d 652 (6th Cir. 2008).

> We have made clear that *Jackson* claims face a high bar in federal habeas proceedings because they are subject to two layers of judicial deference. First, on direct appeal, "it is the responsibility of the jury -- not the court -- to decide what conclusions should be drawn from evidence admitted at trial. A reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury." *Cavazos v. Smith*, 565 U. S. 1, ___, 132 S. Ct. 2, 181 L. Ed. 2d 311, 313 (2011) (*per curiam*). And second, on habeas review, "a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court. The federal court instead may do so only if the state court decision was 'objectively unreasonable.'" *Ibid.* (quoting *Renico v. Lett*, 559 U. S. ___, ___, 130 S. Ct. 1855, 176 L. Ed. 2d 678 (2010)).

*Coleman v. Johnson*, 566 U.S. ___, ___, 132 S. Ct. 2060, 2062, (2012)(*per curiam)*.

This single Ground for Relief encompasses several different arguments attacking different convictions.  They will be dealt with separately.

**Sub-claim One:   Conviction for Robbery of Victim Ingram (Count 2 of Case B-1006797) and Complicity to Robbery of Victims Boogher, Xinyu, Adams, Li, and Quach (Counts 22, 23, 25, 28, and 29 of Case B-1007149)**

Ojile's claim as to these six counts of conviction is that there was insufficient evidence because the crime of robbery as defined by Ohio law was never completed (See, e.g., Memorandum in Support of Petition, Doc. No. 5, PageID 43).

The First District Court of Appeals dealt with this claim on direct appeal.

**[P47]** In his fourth assignment of error, Ojile contends that the evidence was insufficient to support his convictions. He contends that the state failed to prove the essential elements of the various offenses. This assignment of error is not well taken.

**[P48]** The relevant inquiry, when reviewing the sufficiency of the evidence is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the offenses proved beyond a reasonable doubt. *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus; *State v. Russ*, 1st Dist. No. C-050797, 2006 Ohio 6824, ¶ 13.

**[P49]** R.C. 2911.01(A)(1), aggravated robbery, provides that "[n]o person, in attempting or committing a theft offense * * * or in fleeing immediately after the attempt or the offense, shall * * * [h]ave a deadly weapon on or about the offender's person or under the offender's control and either display the weapon, brandish it, indicate that the offender possesses it, or use it." R.C. 2911.02(A)(1), robbery, provides that "[n]o person, in attempting or committing a theft offense or in fleeing immediately after the attempt or offense, shall * * * [h]ave a deadly weapon on or about the offender's person, or under the offender's control."

**[P50]** Ojile argues that the state failed to prove the five counts of complicity to robbery, which were the counts involving Ingram, Boogher, Xinyu, Adams, Li and Quach. He argues that he never made contact with any of these victims and that no theft offense was actually committed. We disagree.

**[P51]** Robbery under R.C. 2911.02(A)(1) is "an offense which itself prohibits an attempt." *State v. Still*, 11th Dist. No. 93-L-195, 1994 Ohio App. LEXIS 5506, *5 (Dec. 9, 1994). A criminal attempt occurs when an offender "purposely does or omits to do anything which is an act or omission constituting a substantial step in a course of conduct planned to culminate in his commission of the crime." *State v. Woods*, 48 Ohio St.2d 127, 357 N.E.2d 1059 (1976), paragraph one of the syllabus, *overruled on other grounds, State v. Downs*, 51 Ohio St.2d 47, 364 N.E.2d 1140 (1977). A substantial step involves conduct that is "strongly indicative of the actor's criminal purpose." *State v. Andrews*, 171 Ohio App. 3d 332, 2007 Ohio 2013, 870 N.E.2d 775, ¶78 (1st Dist.), quoting *Woods* at paragraph one of the syllabus. This standard focuses on the defendant's overt acts that convincingly demonstrate a firm

purpose to commit a crime, while allowing police intervention to prevent the crime when the criminal intent becomes apparent. *Woods* at 132; *State v. Holmes*, 181 Ohio App.3d 397, 2009 Ohio 1241, 909 N.E.2d 163, ¶ 19 (8th Dist).

 **[P52]** R.C. 2923.03(A)(2), the complicity statute, states that "[n]o person, acting with the kind of culpability required for the commission of an offense, shall * * * aid or abet another in committing the offense." To aid or abet is to assist or facilitate the commission of a crime, or to promote its accomplishment. *State v. Johnson*, 93 Ohio St.3d 240, 2001 Ohio 1336, 754 N.E.2d 796 (2001), syllabus; *Holmes* at ¶ 20 (8th Dist.); *Russ*, 1st Dist. No. C-050797, 2006 Ohio 6824, at ¶ 18.

 **[P53]** In the cases of Boogher and Li and Quach, the evidence showed that Ojile and Erkins, acting in concert, had targeted them as their intended victims. One of them followed the victims out of the casino, consistent with the modus operandi in the other robberies. They then followed the victims' cars, but were prevented from actually committing a theft offense. Thus, the evidence showed they took substantial steps showing their criminal purpose to rob the victims. They would have carried out the underlying theft offenses had they not been prevented from doing so. Thus, there was sufficient evidence to support the complicity to robbery convictions involving those victims.

 **[P54]** The same is true of the counts in which Ingram was the intended victim. Ojile contends that the evidence showed only that he and Erkins simply had left the interstate and stopped at the same exit as Ingram. We disagree. Their cell phone conversations showed that they had specifically targeted Ingram as a victim. Erkins had followed Ingram out of the casino. He and Ojile then followed Ingram's car on the highway until he got off at the exit, and they parked near where Ingram had parked. Thus, they took substantial steps showing that they intended to rob Ingram. It did not matter that the object of their intent was factually or legally impossible if they could have committed the offense had the circumstances been what they believed them to be. *See Andrews*, 171 Ohio App.3d 332, 2007 Ohio 2013, 870 N.E2d 775, at ¶ 80.

 **[P55]** Ojile argues that the evidence was insufficient on the complicity to robbery counts involving Adams and Xinyu because he was the only defendant indicted on those counts. But R.C. 2923.03(B) states that "[i]t is no defense to a charge under this section that no person with whom the accused was in complicity has been convicted as a principal offender." Therefore, the state

16

was not required to either identify or charge an individual as a principal offender to obtain convictions against Ojile as a complicitor. *See State v. Gowdy*, 6th Dist. No. E-06-071, 2009 Ohio 385, ¶ 21.

*State v. Ojile*, 2012-Ohio-6015, 2012 Ohio App. LEXIS 5223 (1st Dist. Dec. 21, 2012).

Ojile argues first as to Counts 22, 23, 25, 28, and 29 of Case B-1007149 that there was insufficient proof that any robbery actually occurred (Response to Return of Writ (hereinafter "Response"), Doc. No. 16, PageID 2529-33). The relevant statute is Ohio Revised Code § 2911.02 which provides:

> (A) No person, in attempting or committing a theft offense or in fleeing immediately after the attempt or offense, shall do any of the following:
>
> (1) Have a deadly weapon on or about the offender's person or under the offender's control;
>
> (2) Inflict, attempt to inflict, or threaten to inflict physical harm on another;
>
> (3) Use or threaten the immediate use of force against another.

The First District Court of Appeals interpreted this statute to include attempts to commit a theft offense. That reading is consistent with the plain language of the statute. Ojile notes the reliance of the Warden on this "attempted theft" reading, but claims the Warden "fails to cite any authority even remotely suggesting that an 'attempted theft' is constitutionally sufficient to satisfy the robbery statute." (Response, Doc. No. 16, PageID 2530.) The First District, however, relied on *State v. Woods*, 48 Ohio St. 2d 127 (1976). In that case, handed down shortly after Ohio criminal law was re-codified in 1974, the Supreme Court of Ohio explained the law of attempt under new Title 29:

> R. C. 2923.02(A) provides that: "No person, purposely or knowingly, and when purpose or knowledge is sufficient

culpability for the commission of an offense, shall engage in conduct which, if successful, would constitute or result in the offense."

The committee comment for this section states, in part, that: "In order to prove an attempt to commit an offense, it must be shown that particular conduct directed toward commission of the offense took place and that such conduct, if successful, would constitute or result in the offense. * * *" This language establishes that the essential elements of a criminal attempt are the *mens rea* of purpose or knowledge, and conduct directed toward the commission of an offense. The statute does not, however, indicate how far this conduct must proceed toward the actual consummation of the crime in order to be considered an attempt to commit that crime. There is also little case law in Ohio on this question, although this court has held that the conduct necessary for a criminal attempt "need not be the last proximate act prior to the consummation of the felony." *State* v. *Farmer* (1951), 156 Ohio St. 214, 216, 102 N. E. 2d 11; *Fox* v. *State* (1878), 34 Ohio St. 377. In *Farmer*, an assault with intent to rob was held, at page 217, "sufficient to justify the triers of the facts in determining beyond a reasonable doubt that the action of the defendant at the time of * * * [an] altercation was action taken to carry out that intent and therefore amounted to an attempt to perpetrate robbery." In this case, Reaves committed no assault, and the question arises as to whether his acts nevertheless amounted to an attempt to rob.

American courts have generally agreed that intent to commit a crime does not of itself constitute an attempt, nor does mere preparation. The difficulty is to formulate a standard that excludes preparations prior to an actual attempt to commit a crime, while including, as punishable, those acts which are so dangerously close to resulting in a crime that intervention and arrest by the police are justified, even before the "last proximate act." Various tests have been suggested and followed in other jurisdictions. There is a good discussion of this problem and the various approaches in Wechsler, Jones and Korn, The Treatment of Inchoate Crimes in the Model Penal Code of the American Law Institute: Attempt, Solicitation, and Conspiracy. 61 Columbia L. Rev. 571, 573-621. It is not necessary to consider each of the alternative approaches here. Ohio's statutory definitions of criminal offenses in the Revised Code are based largely upon the American Law Institute's Model Penal Code, and the standard adopted in the latter Code appears to us workable, reasonable, and consistent with the language of R. C. 2923.02(A). Under Section 5.01 of the Model Penal Code, an attempt is when one "purposely does or omits to do anything which

is * * * an act or omission constituting a substantial step in a course of conduct planned to culminate in his commission of the crime." To constitute a "substantial step," the conduct must be "strongly corroborative of the actor's criminal purpose." The application of this standard will of course depend upon both the nature of the intended crime and the facts of the particular case. A substantial step in the commission of a robbery may be quite different from that in arson, rape, or some other crime. But this standard does properly direct attention to overt acts of the defendant which convincingly demonstrate a firm purpose to commit a crime, while allowing police intervention, based upon observation of such incriminating conduct, in order to prevent the crime when the criminal intent becomes apparent.

*Id.* at 131-32.  In *Woods*, the defendant Reaves had climbed on the roof of a store with a gun, apparently to lie in wait for the store manager.  The court found that was "plainly a substantial step in the planned robbery, and certainly was strongly corroborative of the criminal purpose . . ." even though no actual robbery was completed. *Id.* at 132.

As to each of the counts of conviction challenged in Sub-claim One, it is true that no robbery was completed in the sense of actually obtaining money from the person of one of the victims by force.  However, there was substantial evidence as to each of these victims that Ojile and Erkins had the purpose of robbing them and took substantial steps to carry out that purpose. With Officer Ingram, they discussed him as a target, then followed him from the Hollywood Casino to the highway exit where they and he got off.  They took with them significant "tools of the trade" of aggravated robbery, including a Glock handgun.  Ojile argues their conduct in stopping at the Waffle House was completely innocent and they were just headed to Ojile's home on the same street and "never made any physical progress toward robbery." (Memorandum in Support of Petition, Doc. No. 5, PageID 45.)  He fails to mention the targeting conversation and following Ingram from the casino.  The same reasoning supports the court of appeals' decision as to the other convictions challenged in this sub-claim.

19

The nub of Ojile's position is to be found in his Response to Return of Writ.  He states the Warden "fails to cite any authority even remotely suggesting that an 'attempted theft' is constitutionally sufficient to satisfy the robbery statute." (Doc. No. 16, PageID 2530.)  Under the Fourteenth Amendment, it is the States that define the elements of crimes and then must produce sufficient evidence on each of those elements at trial.  *See Winship, supra*.  There is no constitutional minimum to robbery.  With very few exceptions, the Supreme Court has not imposed substantive limitations on state-adopted definitions of criminal behavior.  *See Robinson v. California*, 370 U.S. 660 (1962); *Papachristou v. Jacksonville,* 405 U.S. 156 (1972).  Ohio's definition of robbery as including attempted robbery and its expansion of the concept of attempt to include substantial steps taken to carry out a purpose to commit a crime have never been found unconstitutional, much less by clearly established Supreme Court precedent.


**Sub-claim Two:  First Aggravated Robbery of Michael Weisbrod (Count 3 in Case B-1006797)**

In Sub-claim Two of the First Ground for Relief, Ojile argues there was insufficient evidence to convict him on the first aggravated robbery of Michael Weisbrod (the robbery on which Weisbrod was lured to his basement, apparently by tripping a circuit breaker, then tied up and threatened with a gun).  He argues that Weisbrod and Detective Moy testified only two perpetrators participated in this crime and that he had evidence from Continental Airlines supporting an alibi.

The First District decided this claim as follows:

> **[P56]**  Next, Ojile contends that the state's evidence was insufficient to support the aggravated robbery conviction related to the first Weisbrod robbery. But he is simply arguing that the state's evidence, particularly the testimony of Hoover and Tanks, was not

credible. These arguments go to the weight of the evidence, not its sufficiency, which is a separate concept. *See State v. Thompkins,* 78 Ohio St.3d 380, 387, 1997 Ohio 52, 678 N.E.2d 541 (1997); *State v. Jones,* 1st Dist. No. C-090137, 2010 Ohio 4116, ¶ 42. Further, matters as to the credibility of evidence were for the trier of fact to decide. *State v. Bryan,* 101 Ohio St.3d 272, 2004 Ohio 971, 804 N.E.2d 433, ¶ 116.

*State v. Ojile*, 2012-Ohio-6015, 2012 Ohio App. LEXIS 5223 (1ˢᵗ Dist. Dec. 21, 2012). This finding is plainly a reasonable application of *Jackson v. Virginia,* 443 U.S. 307 (1979). Ojile argues "[t]here was not a scintilla of evidence presented against Ojile on this count besides Hoover's testimony." (Memorandum in Support of Petition, Doc. No. 5, PageID 51.) He completely ignores the admissions he made to Tanks which were testified to at trial. He also ignores the fact that, by itself, Hoover's testimony was sufficient to convict.

In deciding a sufficiency of the evidence claim, courts are not to weigh the evidence, but to determine if there was competent testimony on each element which, if believed by the trier of fact, was sufficient. Plainly there was on this conviction.

**Sub-claim Three: Aggravated Robbery of Davis Nguyen (Count 1 of Case No. B-1007149)**

As to this sub-claim, Ojile focuses on the fact that the victim only stated he was 90% sure of his in-court identification. But *Jackson* does not require that a witness state any particular level of certainty in his identification to provide proof beyond a reasonable doubt. Ojile ignores the corroborative facts that Nguyen said his attacker fled in a white SUV and Tanks testified Ojile told him he feared one of his victims could identify a white Ford Escalade Ojile was driving during one of the incidents. Ojile also ignores the corroborative facts that Nguyen's personal information (name, date of birth, address, and Social Security number) were found

handwritten on the back of a business card found in Ojile's wallet when he was arrested.  Ojile

argues "the state was unable to show any connection between this information and the robbery. .

."  No connection, that is, except that Nguyen's wallet with this information in it was taken

during the robbery and no innocent explanation of why the information was in Ojile's wallet was

offered.

**Sub-claim Four:  Second aggravated Robbery of Michael Weisbrod (Count 11 of case No. B-1007149)**

With respect to this conviction, Ojile complains of a supposedly suspect in-court

identification which he says Weisbrod made with some equivocation and lack of detail about the

offense (Memorandum in Support of Petition, Doc. No. 5, PageID 53-54).  This sub-claim is

without merit for the same reason as the claim with respect to Nguyen's identification.  Certainty

is not required for sufficiency.  Weisbrod readily identified Amy Hoover as the woman who

knocked on his door before the first robbery.  The situation in which in-court identifications are

made is in itself suggestive, but no United States Supreme Court precedent puts restraints on how

these identifications occur.

**Sub-claim Five:  Aggravated Robbery of Daniel Duncan (Count 12 of Case No. B-1007149)**

With respect to this conviction, Ojile says the sole evidence on which he was convicted is

that six months after Duncan was robbed, the handgun which was taken from him was found in

Ojile's gym bag in Erkins' vehicle (Memorandum in Support of Petition, Doc. No. 5, PageID

54).  He argues Tyrone Tanks' testimony that Ojile admitted to committing a robbery with

Erkins in which they took the victim's handgun should be ignored because Tanks is a perjurer. *Id.*

Ojile analogizes his case to *Joseph v. Coyle*, 469 F.3d 441 (6th Cir. 2006), where the court held that if the circumstantial evidence pointed equally to one of two people, it cannot be said to have been proven beyond a reasonable doubt that one of them did it  However, in the *Joseph* case only one person could have done the actual stabbing.  As this crime spree shows, it is perfectly possible for two people to commit a robbery together and Ojile admitted to Tanks that he had robbed a man under circumstances like those described by Duncan and had stolen his gun.

**Sub-claim Six:  Aggravated Robbery and Felonious Assault of Tien Dao (Counts 14, 15, and 16 of Case No. B-1007149)**

In his Sixth Sub-claim, Ojile asserts there was insufficient evidence to convict him of the aggravated robbery and felonious assault of victim Tien Dao.

In the first part of this sub-claim, he asserts the testimony of Agent Crock was insufficient to establish that Dao's personal papers, taken during the robbery, were found during a search of the residence Ojile shared with his girlfriend  (Memorandum in Support of Petition, Doc. No. 5, PageID 56). Ojile's theory on this point is presented and dealt with at length in his Seventh Ground for Relief claiming denial of the right to confrontation, *infra*.

There were two men involved in this robbery of Dao.  The State tried both Ojile and Erkins; Judge Allen convicted Ojile and acquitted Erkins.  Ojile asserts this means Judge Allen "had to have relied on the sole piece of information that victims [sic] property was recovered at Ojile's girlfriend's residence to convict Ojile."  *Id.*  at PageID 56-57.  He also notes the First

District relied on video surveillance showing Erkins following Dao at the casino and claims this information is erroneous because "in reviewing the entire trial record, there is absolutely no evidence showing Erkins following this victim – Tien Dao – out [of] the casino." *Id.* at PageID 57.

The First District's finding was "[a]dditionally, video surveillance tapes showed Erkins following Dao as he left the casino on June 28." *State v. Ojile*, 2012-Ohio-6015, ¶ 27  2012 Ohio App. LEXIS 5223 (1st Dist. Dec. 21, 2012).  The Warden does not respond in the Return of Writ to Ojile's claim that this finding is not supported by the record (Return of Writ, Doc. No. 13, PageID 176-77) and Ojile repeats it without further elaboration in his Response (Doc. No. 16, PageID 2545).

Findings of fact by the state courts are, upon consideration in habeas corpus, presumed to be correct unless shown by the habeas applicant to be incorrect by clear and convincing evidence.  28 U.S.C. § 2254(e)(1).  Ojile gives this Court no record reference to meet his burden of proof.  He asserts the First District picked up the misinformation from the State's Brief on direct appeal at page 19 (Return of Writ, Doc. No. 13-1, PageID 435).  The assertion made there is "[t]he State also produced video surveillance tape that shows Erkins following Dao as he left the casino on June 28th.  (T.p. 1084-1086, State's Exhibit #23-G)."  Having reviewed the testimony that appears at that point in the transcript, the Court finds it supports the First District's factual finding.

Finally, in making his argument on this sub-claim, Ojile ignores Tanks' testimony that Ojile admitted to him being involved in a robbery in which personal identification was taken from a victim and later found at his residence.  Ojile wants the Court to ignore Tanks' testimony, but Judge Allen did not.

Thus there was clearly sufficient evidence to convict Ojile of the felonious assault on and aggravated robbery from Tien Dao.

**Sub-claim Seven:  Conspiracy to Commit Aggravated Robbery of Kiran Racherla (Count 26 of Case No. B-1007149)**

In his Seventh Sub-claim, Ojile claims there was insufficient evidence presented to convict him with respect to the aggravated robbery of Kiran Racherla.  He notes that the First District relied on cell phone records that showed he was in the same area where the robbery occurred, but that his counsel had objected to admission of those records (Memorandum in Support of Petition, Doc. No. 5, PageID 58-59).  The First District also relied on recovery from the car in which Erkins and Ojile were arrested of the handgun stolen from Duncan which contained Racherla's DNA.[2]  Ojile contends it was Erkins' car. *Id.*  at PageID 58.

Ojile contends the First District erred in concluding the same modus operandi was employed in this crime as in other robberies in which Ojile was involved. *Id.*  Finally, Ojile contends there is an inconsistency in the verdicts because Erkins was convicted of felonious assault arising out of this crime, but Ojile was acquitted on that count (Count 27). *Id.*  at PageID 59.

The handgun taken from Duncan was recovered not just from the car in which Ojile was present when arrested, but from his backpack which was between his legs at the time of arrest. While it is true that Racherla testified to only one attacker whom he could not identify, Ojile's possession of the handgun with which Racherla was struck is corroborative of his involvement in the crime; no innocent explanation of the gun's presence in Ojile's possession is offered.

Ojile points to Judge Allen's reservation of a ruling on the cellphone records and no later

---

[2] Racherla testified his attacker struck him three times in the head with a handgun.

25

mention. When the trial record on this point is examined, the Court finds that Officer Will Kinney testified from cellphone records what they showed as to where Ojile was at the time of the robbery (Trial Tr., Return of Writ, Doc. No. 13-17, PageID 1129-32). Mr. Gibson objected that the State had not laid an appropriate foundation to have Kinney testify on that point and it is on the foundational objection that Judge Allen reserved ruling. When evidence is offered and objected to with a ruling reserved, it must be presumed that the objection was overruled and the evidence considered, especially in a case tried to the bench. *State v. Kleinfeld*, 2010-Ohio-1372, ¶ 7, 2010 Ohio App. LEXIS 1157 (9th Dist. 2010); *Kott Enters. V. Brady*, 2004-Ohio-7160, ¶ 40, 2004 Ohio App. LEXIS 6617 (6th Dist. 2004); . This portion of the sub-claim also appears to have been abandoned on appeal to the Ohio Supreme Court since none of the Propositions of Law presented to that court calls out this asserted evidentiary error.

Ojile's objection to the modus operandi finding is frivolous, given the similarities in these various crimes: successful or older or Asian victims targeted at Indiana casinos and followed home where they are robbed at gunpoint.

Ojile's Seventh Sub-claim is not well-taken and should be dismissed with prejudice.

**Ground Two: Ineffective Assistance of Trial Counsel**

In his Second Ground for Relief, Ojile asserts he received ineffective assistance of trial counsel, raising three sub-claims:

> **Sub-claim One:** Failure of trial counsel to secure the testimony of Ojile's alibi witness to explain documented flight records she sent in which would have verified Ojile's alibi information.

> **Sub-claim Two:** Failure of trial counsel to introduce evidence in his possession marked "for counsel only" that proved it was

> physically impossible for Ojile to have committed the robbery on
> Danielle Duncan on Counts 12 of B1007149.
>
> **Sub-claim Three:** Failure of trial counsel to suppress statements
> Ojile allegedly made to "jailhouse informant"', Tyrone Tanks, that
> was obtained in violation of Ojile's 6th Amendment right to
> counsel.

In his **First Sub-claim**, Ojile asserts he received ineffective assistance of trial counsel when his trial attorney did not secure the presence at trial of his alibi witness, Allyson Hawkins. Ms. Hawkins allegedly could have provided proof that Petitioner was on airline flights to and from New York at the time of the robbery charged in Count 3 of Case No. B-1006797 by explaining the documents from the airlines which were tendered as exhibits (Memorandum in Support of Petition, Doc. No. 5, PageID 60-64).

Ojile asserts he raised this issue in his Application for Reopening under Ohio R. App. P. 26(B)(Petition, Doc. No. 1, Ground Two, ¶ c.2, PageID 7). The Warden asserts Ojile procedurally defaulted this claim by not raising it on direct appeal (Return of Writ, Doc. No. 13, PageID 179). In his Response, Ojile argues the merits of the ineffective assistance of trial counsel claim without responding to the procedural default argument (Response, Doc. No. 16, PageID 2548-52).

The governing standard for ineffective assistance of counsel is found in *Strickland v. Washington*, 466 U.S. 668 (1984):

> A convicted defendant's claim that counsel's assistance was so
> defective as to require reversal of a conviction or death sentence
> has two components. First, the defendant must show that counsel's
> performance was deficient. This requires showing that counsel
> was not functioning as the "counsel" guaranteed the defendant by
> the Sixth Amendment. Second, the defendant must show that the
> deficient performance prejudiced the defense. This requires
> showing that counsel's errors were so serious as to deprive the

> defendant of a fair trial, a trial whose result is reliable.  Unless a
> defendant makes both showings, it cannot be said that the
> conviction or death sentence resulted from a breakdown in the
> adversary process that renders the result unreliable.

466 U.S. at 687.

With respect to the first prong of the *Strickland* test, the Supreme Court has commanded:

> Judicial scrutiny of counsel's performance must be highly
> deferential. . . .  A fair assessment of attorney performance requires
> that every effort be made to eliminate the distorting effects of
> hindsight, to reconstruct the circumstances of counsel's challenged
> conduct, and to evaluate the conduct from counsel's perspective at
> the time.  Because of the difficulties inherent in making the
> evaluation, a court must indulge a strong presumption that
> counsel's conduct falls within a wide range of reasonable
> professional assistance; that is, the defendant must overcome the
> presumption that, under the circumstances, the challenged action
> "might be considered sound trial strategy."

466 U.S. at 689.

As to the second prong, the Supreme Court held:

> The defendant must show that there is a reasonable probability
> that, but for counsel's unprofessional errors, the result of the
> proceeding would have been different.  A reasonable probability is
> a probability sufficient to overcome confidence in the outcome.

466 U.S. at 694.  *See also Darden v. Wainwright*, 477 U.S. 168 (1986); *Wong v. Money,* 142

F.3d 313, 319 (6th Cir. 1998); *Blackburn v. Foltz*, 828 F.2d 1177 (6th  Cir. 1987).  *See generally*

Annotation, 26 ALR Fed 218.

A criminal defendant is entitled to effective assistance of counsel on appeal as well as at

trial, counsel who acts as an advocate rather than merely as a friend of the court. *Evitts v. Lucey*,

469 U.S. 387 (1985); *Penson v. Ohio*, 488 U.S. 75 (1988); *Mahdi v. Bagley*, 522 F.3d 631, 636

(6th Cir. 2008).  The *Strickland* test applies to appellate counsel.  *Smith v. Robbins*, 528 U.S. 259,

285 (2000); *Burger v. Kemp,* 483 U.S. 776 (1987).  To evaluate a claim of ineffective assistance

of appellate counsel, then, the court must assess the strength of the claim that counsel failed to raise. *Henness v. Bagley*, 644 F.3d 308 (6th Cir. 2011), *citing Wilson v. Parker*, 515 F.3d 682, 707 (6th Cir. 2008). Counsel's failure to raise an issue on appeal amounts to ineffective assistance only if a reasonable probability exists that inclusion of the issue would have changed the result of the appeal. *Id*., *citing Wilson.* If a reasonable probability exists that the defendant would have prevailed had the claim been raised on appeal, the court still must consider whether the claim's merit was so compelling that the failure to raise it amounted to ineffective assistance of appellate counsel. *Id., citing Wilson.* The attorney need not advance every argument, regardless of merit, urged by the appellant. *Jones v. Barnes*, 463 U.S. 745, 751-752 (1983)("Experienced advocates since time beyond memory have emphasized the importance of winnowing out weaker arguments on appeal and focusing on one central issue if possible, or at most on a few key issues." 463 U.S. 751-52). Effective appellate advocacy is rarely characterized by presenting every non-frivolous argument which can be made. *Joshua v. DeWitt*, 341 F.3d 430, 441 (6th Cir. 2003); *Williams v. Bagley,* 380 F.3d 932, 971 (6th Cir. 2004), *cert. denied,* 544 U.S. 1003 (2005); *see Smith v. Murray*, 477 U.S. 527 (1986).

The procedural default doctrine in habeas corpus is described by the Supreme Court as follows:

> In all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an adequate and independent state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause of the default and actual prejudice as a result of the alleged violation of federal law; or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice.

*Coleman v. Thompson*, 501 U.S. 722, 750 (1991); *see also Simpson v. Jones*, 238 F.3d 399, 406 (6th Cir. 2000). That is, a petitioner may not raise on federal habeas a federal constitutional right

29

he could not raise in state court because of procedural default. *Wainwright v. Sykes*, 433 U.S. 72 (1977); *Engle v. Isaac*, 456 U.S. 107, 110 (1982). Absent cause and prejudice, a federal habeas petitioner who fails to comply with a State's rules of procedure waives his right to federal habeas corpus review. *Boyle v. Million*, 201 F.3d 711, 716 (6th Cir. 2000)(citation omitted); *Murray v. Carrier*, 477 U.S. 478, 485 (1986); *Engle*, 456 U.S. at 110; *Wainwright*, 433 U.S. at 87. *Wainwright* replaced the "deliberate bypass" standard of *Fay v. Noia*, 372 U.S. 391 (1963). *Coleman*, 501 U.S. at 724.

The Sixth Circuit Court of Appeals requires a four-part analysis when the State alleges a habeas claim is precluded by procedural default. *Guilmette v. Howes,* 624 F.3d 286, 290 (6th Cir. 2010)(*en banc*); *Eley v. Bagley*, 604 F.3d 958, 965 (6th Cir. 2010); *Reynolds v. Berry*, 146 F.3d 345, 347-48 (6th Cir. 1998), *citing Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986); *accord Lott v. Coyle*, 261 F.3d 594, 601-02 (6th Cir. 2001); *Jacobs v. Mohr*, 265 F.3d 407, 417 (6th Cir. 2001).

> First the court must determine that there is a state procedural rule that is applicable to the petitioner's claim and that the petitioner failed to comply with the rule.
>
>     . . . .
>
> Second, the court must decide whether the state courts actually enforced the state procedural sanction, citing *County Court of Ulster County v. Allen*, 442 U.S. 140, 149, 99 S.Ct. 2213, 60 L.Ed.2d 777 (1979).
>
> Third, the court must decide whether the state procedural forfeiture is an "adequate and independent" state ground on which the state can rely to foreclose review of a federal constitutional claim.
>
> Once the court determines that a state procedural rule was not complied with and that the rule was an adequate and independent state ground, then the petitioner must demonstrate under *Sykes* that there was "cause" for him to not follow the procedural rule and that he was actually prejudiced by the alleged constitutional error.

*Maupin*, 785 F.2d at 138; accord, *Hartman v. Bagley,* 492 F.3d 347, 357 (6th Cir. 2007), *quoting Monzo v. Edwards*, 281 F.3d 568, 576 (6th Cir. 2002).

The Warden asserts this sub-claim could have been raised on direct appeal and was not. Under Ohio law, ineffective assistance of trial counsel claims which depend on the appellate record are barred by *res judicata* if not raised on direct appeal. *State v. Perry*, 10 Ohio St. 2d 175 (1967). Ohio's doctrine of *res judicata* in criminal cases, enunciated in *Perry,* is an adequate and independent state ground. *Durr v. Mitchell*, 487 F.3d 423, 432 (6th Cir. 2007); *Buell v. Mitchell*, 274 F.3d 337 (6th Cir. 2001); *Coleman v. Mitchell*, 268 F.3d 417 (6th Cir. 2001); *Byrd v. Collins*, 209 F.3d 486, 521-22 (6th Cir. 2000); *Rust v. Zent,* 17 F.3d 155, 160-61 (6th Cir. 1994)(citation omitted); *Van Hook v. Anderson*, 127 F. Supp. 2d 899, 913 (S.D. Ohio 2001). Therefore Sub-claim One of Ground Two is procedurally defaulted unless Ojile can show excusing cause and prejudice.

Ojile does not argue this point except inferentially by pointing to his having claimed it was ineffective assistance of appellate counsel not to raise it on direct appeal. Ineffective assistance of appellate counsel can serve to excuse a procedural default in presenting a claim on direct appeal, but only if the ineffective assistance of appellate counsel claim has been properly presented. *Edwards v. Carpenter*, 529 U.S. 446 (2000). Ojile did properly present his ineffective assistance of appellate counsel claim in his 26(B) Application (Return of Writ, Doc. No. 13-2, PageID 578). However, the First District denied that claim on the merits. *Id.* at PageID 595.

The First District decision on the 26(B) Application is quite summary: "The Court finds that the application is not well taken and [it] is overruled." *Id.* However, a habeas court must review the decision and not the state court's explanation (or lack of explanation) of the decision.

31

*Harrington v. Richter,* 562 U.S. 86, ___, 131 S.Ct. 770, 7854 (2011). The First District's decision on this claim is not an unreasonable application of *Strickland, supra*, because the unsubpoenaed witness could not have established Ojile's claimed alibi. As noted by the Warden, Ms. Hawkins' Affidavit establishes that she is a custodian of records for Continental Airlines and not a person who could testify from personal knowledge that Ojile was on either one of the flights he claims to have been on.[3] It is not ineffective assistance of trial counsel to fail to call a witness who cannot establish the fact for which the witness was to have been called. It was therefore not ineffective assistance of appellate counsel to fail to raise this claim on direct appeal. Sub-claim One of Ground Two should be dismissed with prejudice as procedurally defaulted.

       In **Subclaim Two** Ojile asserts he received ineffective assistance of trial counsel when his trial counsel failed to introduce evidence in his possession marked "for counsel only" that proved it was physically impossible for Ojile to have committed the robbery on Danielle Duncan on Counts 12 of B1007149.

       Ojile presented this claim to the Ohio courts in his petition for post-conviction relief under Ohio Revised Code § 29543.21 (Petition, Doc. No. 1, PageID 7). The final state court decision on this claim is the First District's affirmance of denial or relief on that petition. That court held:

> [T]he challenge was properly denied without a hearing on the alternative ground that Ojile failed to demonstrate an entitlement to relief. See R.C. 2953.21(E) and (G). The cell-phone-tower information would not have established the defense of alibi based on the physical impossibility of Ojile's guilt in the robbery, because the records do not place Ojile in a location other than the crime-scene when the crime was committed. See Black's Law

---

[3] Judge Litkovitz denied Ojile's Motion to Supplement the Record with an Affidavit from Debbie Myers of United Airlines in further support of this claim. As Judge Litkovitz held, addition of that document is prohibited by the AEDPA. See Doc. No. 17, citing *Cullen v. Pinholster,* 563 U.S. ___, 131 S. Ct. 1388 (2011).

> Dictionary 84 (9th Ed.2004) 84 (defining "alibi"); see also Crim.R.
> 12.1 (requiring a notice of alibi to "include specific information as
> to the place at which the defendant claims to have been at the time
> of the alleged offense"),  Therefore, Ojile failed to demonstrate
> that, but for counsel's failure to present that information at trial, the
> results of his trial would have been different. See *Strickland v.
> Washington*, 466 U.S. 668, 694, 104 S.Ct. 2052, So L.Ed.2d 674
> (1984); *State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373
> (1989).

*State v. Ojile,* Appeal No. C-120601 (1st Dist. June 12, 2013)(unreported, copy at Return of Writ,

Doc. No. 13-2, PageID 843, et seq.)

In his Memorandum in Support, Ojile argues that, even if these cell tower records alone

could not establish an alibi for the Duncan aggravated robbery, they could have proven it was

physically impossible to have committed the crime when considered in conjunction with the

cellphone evidence presented against co-defendant Erkins on this count, combined with the

failure of the victim to identify him as involved (Doc. No. 5, PageID 65-67).  In his Response, he

essentially argues that Erkins' cellphone records place Erkins close to the scene of the robbery at

the time it happened, yet Erkins was acquitted on this count (Doc. No. 16, PageID 2552).

A decision about what evidence to introduce must be made before the defendant rests.

Ojile's trial counsel could not have known at the time he made the decision not to introduce

these records what the jury was likely to do with respect to Erkins, nor do we have any evidence

as to why Erkins was acquitted on this count.  The fact remains that the records do not prove

what Ojile asserts – that it was physically impossible for him to have committed this robbery –

and we cannot rely on post-trial hindsight to speculate what effect their introduction would have

had on the jury.  The First District's decision on this sub-claim is not an objectively unreasonable

application of *Strickland*.  The sub-claim should therefore be dismissed with prejudice.

In **Sub-claim Three** Ojile asserts he received ineffective assistance of trial counsel as trial counsel failed to suppress statements Ojile allegedly made to Tyrone Tanks, statements Ojile claims were obtained in violation of his Sixth Amendment right to counsel. Ojile raised this claim on direct appeal as his seventh assignment of error and the First District decided it as follows:

> **[P69]** In his seventh assignment of error, Ojile contends that he was denied the effective assistance of counsel. He argues that his attorney's performance was deficient because he failed to move to exclude the statements Ojile had allegedly made to Tanks while in jail, and that he was prejudiced by that failure. This assignment of error is not well taken.

> **[P70]** A court will presume that a properly licensed attorney is competent, and the defendant bears the burden to show ineffective assistance of counsel. *State v. Hamblin*, 37 Ohio St.3d 153, 155-156, 524 N.E.2d 476 (1988); *State v. McCrary*, 1st Dist. No. C-080860, 2009 Ohio 4390, ¶ 12. To sustain a claim for ineffective assistance of counsel, a defendant must demonstrate that counsel's performance was deficient, and that the deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *McCrary* at ¶ 12.

> **[P71]** Tanks testified that Ojile had started talking to him shortly after Tanks arrived at the jail in February 2011. Eventually, Ojile made incriminating statements about the robberies. Tanks reported those statements to the state. He met with prosecutors in early April 2011. Ojile claims that the state "must have known that Tanks would continue to garner incriminating information from Ojile" after he had spoken with prosecutors, in violation of Ojile's Sixth Amendment right to counsel. *See Maine v. Moulton*, 474 U.S. 159, 176, 106 S.Ct. 477, 88 L.Ed.2d 481 (1985); *United States v. Henry*, 447 U.S. 264, 274, 100 S.Ct. 2183, 65 L.Ed.2d 115 (1980). Therefore, he contends, counsel's performance was deficient because he failed to move to exclude Tank's testimony.

> **[P72]** Ojile has failed to meet his burden to show that he was prejudiced by his counsel's failure to move to exclude Tanks's testimony. The record does not support Ojile's claim that Tanks provided damaging testimony about any specific statements Ojile had made after Tanks had met with prosecutors. Even Ojile acknowledges that "it was not clear from his testimony what Tanks

> learned after his meeting with the State." Further, even if the
> admission of Tanks' testimony was improper, we cannot say that it
> was prejudicial in the overall context of the trial given the
> overwhelming evidence against Ojile. *See State v. Hirsch*, 129
> Ohio App.3d 294, 315, 717 N.E.2d 789 (1st Dist.1998). We,
> therefore, overrule Ojile's seventh assignment of error.

*State v. Ojile*, 2012-Ohio-6015, 2012 Ohio App. LEXIS 5223 (1ˢᵗ Dist. Dec. 21, 2012).

Ojile also raised this claim as Ground One of his Petition for Post-Conviction Relief. He refers in his Reply in support of his Post-Conviction Petition to Tanks' statement to the prosecutor of April 6, 2011, which he refers to as a "deposition," but which is in the record as an attachment to his Post-Conviction Petition as the "Proffered Statement of Tyrone Tanks." (Return of Writ, Doc. No. 13-2, PageID 750-802.) Ojile did not specifically raise denial of this claim as an assignment of error on appeal to the First District. The First District disposed of this claim under the assignment of error wherein Ojile claimed he was entitled to an evidentiary hearing. It held:

> Ojile's first through fourth postconviction claims were subject to
> dismissal without a hearing. The claims involved substantially the
> same facts and issues that Ojile had raised, and that we had
> rejected, in the direct appeals. *See Ojile*,. 1st Dist. Nos. C-110677
> and C-110678, 2012-Ohio-6015, at ¶ 56, 59, and 69-84. Thus,
> under the doctrine of the law of the case, the common pleas court,
> in reviewing those claims, was bound by the law of our decision in
> those appeals. *See Nolan v. Nolan*, 11 Ohio St.3d 1, 3, 462 N.E.2d
> 410 (1984); *Perez v. Cleveland*, 1st Dist. No. C-940553, 1995
> Ohio App. LEXIS 5436 (Dec. 13, 1995); *see also State v. Fischer*,
> 128 Ohio St.3d 92, 2010-Ohio-6238, 942 N.E.2d 332, ¶ 33-35
> (noting that "the law-of-the-case doctrine is rooted in principles of
> res judicata and issue preclusion" and "retains its vitality in Ohio").

*State v. Ojile*, Case No. C-120601 (1ˢᵗ Dist. June 12, 2013)(unreported, copy at Return of Writ, Doc. No. 13-2, PageID 844.)

In his Memorandum in Support, Ojile does not focus on how or why either of these decisions is an unreasonable application of *Strickland*. Instead, he makes factual arguments

purportedly supported by record citations which leads the Court to understand he is claiming the appellate court decision is based on an unreasonable determination of the facts in light of the evidence presented, a claim under 28 U.S.C. § 2254(d)(2) rather than (d)(1)(Memorandum in Support of Petition, Doc. No. 5, PageID 67-69).

The Warden argues this Sub-claim in tandem with arguing Ground Eight (Return of Writ, Doc. No. 13, PageID 183-89). Ojile's Response relies entirely on what he has to say on Ground Eight (Doc. No. 16, PageID 2552-53). It is accordingly dealt with below.


**Ground Three: Use of Impermissibly Suggestive Identification Procedure**


In his Third Ground for Relief, Ojile asserts he was deprived of due process when the prosecutor used an impermissibly suggestive identification procedure. Ojile raised this claim on direct appeal as his eighth assignment of error and the First District decided it as follows:

> **[P73]** In his eighth assignment of error, Ojile contends he was denied a fair trial when the trial court allowed Weisbrod to identify Ojile in court as one of the persons who robbed him. He argues that because the in-court identification was the result of an unreliable pretrial identification produced by unduly suggestive pretrial techniques used by the state, the trial court should not have allowed the in-court identification into evidence. This assignment of error is not well taken.
>
> **[P74]** We first note that Ojile failed to file a motion to suppress the identification evidence. Therefore, he waived any error, except plain error. *State v. Bates*, 1st Dist. No. C-040698, 2005 Ohio 3394, ¶ 16-18; *State v. Williamson*, 2d Dist. No. 19832, 2003 Ohio 6541, ¶ 17.
>
> **[P75]** Although Ojile argues about the in-court identification, his main complaint is that the pretrial identification was unreliable. Generally, a trial court must suppress a pretrial identification of a suspect if the confrontation was unnecessarily suggestive of the suspect's guilt and the identification was unreliable under the

circumstances. *State v. Waddy*, 63 Ohio St.3d 424, 438, 588 N.E.2d 819 (1992); *State v. Bell*, 1st Dist. No. C-030726, 2004 Ohio 3621, ¶ 16. The defendant bears the burden of proving both prongs of the test. *Manson v. Brathwaite*, 432 U.S. 98, 114, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977); *State v. Smith*, 1st Dist. Nos. C-080712 and C-090505, 2009 Ohio 6932, ¶ 16. Suggestive identification procedures are unreliable if they create a substantial likelihood of misidentification. *Waddy* at 439; Smith at ¶ 16.

 **[P76]** The record shows that when Weisbrod was robbed the second time, it occurred in the well-lit parking lot of his residence. He was able to get a good look at the faces of his attackers. He told the investigating police officer that if he saw the attackers again, he would be able to identify them. Several months later, Weisbrod saw news reports about the arrest of Hoover, Erkins and Ojile, which displayed pictures of them. Weisbrod recognized them and was able to identify them to the police.

 **[P77]** Witness exposure to photographs of the suspect shown on television before the identification does not require suppression of the identification. If no state action was involved in any pretrial exposure to a television news cast showing the defendant's picture, any alleged suggestiveness goes to the weight and credibility of the witness's testimony, rather than to its admissibility. *State v. Monford*, 190 Ohio App.3d 35, 2010 Ohio 4732, 940 N.E.2d 634, ¶ 55 (10th Dist.); *State v. Ward*, 10th Dist. No. 00AP-241, 2001 Ohio App. LEXIS 588, *8-11 (Feb. 20, 2001), citing *State v. Brown*, 38 Ohio St.3d 305, 310-311, 528 N.E.2d 523 (1988).

 **[P78]** The record shows that both Weisbrod's pretrial identification and his subsequent in-court identification of Ojile were reliable and that there was no likelihood of misidentification. The in-court identification was the result of Weisbrod's previous identification of Ojile. Consequently, Ojile has failed to show that the court erred in allowing Weisbrod's in-court identification of Ojile, must less that it committed plain error. We overrule Ojile's eighth assignment of error.

*State v. Ojile, supra.*

In his Memorandum in Support, Ojile claims the court of appeals entirely missed his point, which is that the prosecutor had shown victim Michael Weisbrod a single photograph of Ojile several weeks before trial (Doc. No. 5, PageID 71). The Warden acknowledges that the

court of appeals did not address this claim, but asserts that:

> The record demonstrates that Weisbrod was not asked to identify the perpetrators from a line-up or photo array or a single photo. The prosecutor merely showed him pictures of [co-defendants] Hoover, Erkins and Ojile and Weisbrod indicated that he recognized the individuals.  The prosecutor did not ask him whether the individuals depicted were the persons who robbed him.  (Tr. 564-566).  Also, the prosecutor showed Weisbrod the photo of Ojile after he had already recognized him in the newspaper photograph. (Tr. 586-587).

(Return of Writ, Doc. No. 13, PageID 193.)

The testimony of Michael Weisbrod is quite clear that when he was robbed the first time in February 2009, having been lured to his basement by someone's tripping the circuit breaker, he could not see his attackers, but one was male and one was female (Trial Tr. at Return of Writ, Doc. No. 13-13, PageID 1530 et seq.).  They tied him up with duct tape and then the female was sent twice to his apartment to look for his money, finding it in the nightstand the second time. The second time the robbers were two males who robbed him at gunpoint outside his home in a well-lit area.  This time he told the investigating officer that he would be able to recognize the robbers.  Sometime later a friend sent him an electronic message that Hoover, Erkins, and Ojile had been arrested.  He went online and recognized Erkins and Ojile.  He testified at trial by video conference hook-up and identified both of them in the courtroom.

Weisbrod also testified that about two weeks before trial the prosecutor, Mr. Gibson, showed him single photographs of the three co-defendants who were going to be on trial and he volunteered that he recognized Erkins and Ojile.  Ojile concludes from this "that if any two black males were subjected to the same sequence of events, Weisbrod would have identified them as his attackers. . ."  (Response, Doc. No. 16, PageID 2555.)

The Court disagrees with the Warden's assertion that this claim is procedurally defaulted

by Ojile's failure to file a motion to suppress.  Although that was the basis of the First District's decision to review only for plain error, the defense was not on notice to file a pretrial motion to suppress because there was no investigatory procedure used by the Cincinnati Police which would have given rise to a motion to suppress.  Weisbrod first identified Erkins and Ojile from photographs which appeared on the Internet.[4]  Ojile would have had no basis for a motion to suppress because it is not state action for news sources to publish photographs of persons who have been arrested.  The objection on the record at trial was sufficient to preserve this claim.

However, the claim is without merit. The relevant identification in this case is the in-court identification made by Weisbrod.  The Supreme Court has held pretrial screening of eyewitness testimony for reliability is required only when the police have arranged suggestive circumstances which lead to the identification.  There is no requirement for such screening when the suggestion is produced by circumstances the police did not create. *Perry v. New Hampshire*, 565 U.S. ___, 132 S. Ct. 716, 181 L. Ed. 2d 694 (2012).

Ojile argues that the news report Weisbrod viewed was "extremely suggestive because it contained a story of 'casino robbers' after Ojile had already been indicted of [sic] robbing Weisbrod on Counts [sic] 3 of B-1006797."  (Response, Doc. No. 16, PageID 2556).  The point is that the police did not create the occasion for Weisbrod to see the news photographs.

Ojile also argues the in-court identification is suspect because he and Erkins were the only two black men in the courtroom when Weisbrod made the identification.  It is certainly true that the circumstances at trial can be inherently suggestive – typically only one person is sitting with defense counsel, although in this case there would have been one attorney with each defendant.  But the Supreme Court has never held that that courtroom situation, which is

---

[4] Weisbrod was told by a friend that there had been arrests in Cincinnati for robbers of casino patrons and was given a link to view the report.  It is unclear from the testimony whether the link was to still photographs or video.

ubiquitous, violates a defendant's constitutional rights.

With respect to the single photo displayed two weeks before trial, Weisbrod testified he was not asked to make an identification, but volunteered one.  While there is no testimony to that effect, the display may have reinforced Weisbrod's identification of Ojile, but there is no evidence to contradict Weisbrod's testimony that he made his initial identification from the news sources.

Ground Three is therefore without merit and should be dismissed with prejudice.


**Ground Four:  Violation of Due Process:  *Brady v. Maryland***


In his Fourth Ground for Relief, Ojile asserts his due process rights were violated when the prosecutor failed to turn over the single photograph of Ojile he showed to Michael Weisbrod two weeks before trial.  Ojile's theory is that if the photograph had been turned over, his counsel could have filed a motion to suppress the in-court identification which would have been successful.

Ojile pleads that he first raised this claim as part of his 26(B) Application (Petition, Doc. No. 1, PageID 10).  On that basis, the Warden asserts the claim is procedurally defaulted (Return of Writ, Doc. No. 13, PageID 195).  Ojile makes no response to this assertion in his Response (Doc. No. 16, PageID 2564-68).

The Magistrate Judge concludes this defense is well taken.  All of the evidence on which the claim relies was part of the record on direct appeal, but this claim was not raised there.  Ojile sought to excuse that default by claiming in his 26(B) Application that he received ineffective assistance of appellate counsel when his direct appeal attorney did not raise this claim.  As noted

above, the First District summarily denied that claim on the merits, but this habeas court must still review that decision through the lens of AEDPA deference. *Harrington v. Richter, supra.*

The Court concludes it was not ineffective assistance of appellate counsel to fail to raise a *Brady* claim regarding this single photograph on direct appeal because it is not a meritorious *Brady* claim. The State's duty under *Brady v. Maryland*, 373 U.S. 83 (1963), is to produce **exculpatory** evidence. But the single photograph of Ojile which Gibson showed to Weisbrod is inculpatory, not exculpatory. Weisbrod's volunteered identification of Ojile upon being shown the photograph is also inculpatory, not exculpatory.

Ojile's argument attempts to extend *Brady* to pre-trial disclosure of all the State's identification evidence, but *Brady* does not reach that far. There is no constitutional right to pre-trial discovery of the State's evidence in a criminal case. *United States v. Presser*, 844 F.2d 1275, 1284 (6th Cir. 1988), *citing Weatherford v. Bursey*, 429 U.S. 545, 559 (1977).

Ojile places much emphasis on Ohio Revised Code § 2933.83 which governs the conduct of "line lineups" and "photo lineups" in Ohio after its effective date of July 6, 2010. Whether or not the display of Ojile's single photograph to Weisbrod violated this section is purely a question of state law. The United States Supreme Court has not by clearly established law provided that such procedures are constitutionally required. And this Court is both bound by state court interpretation of state law and unauthorized to grant habeas relief for violations of state law.

The Fourth Ground for Relief should be dismissed with prejudice.

**Ground Five: Prosecutorial Misconduct: Use of Knowingly Perjured Testimony**

.

In his Fifth Ground for Relief, Ojile asserts his due process rights were violated when the prosecutor knowingly used perjured testimony to convict him. In particular he asserts the

41

testimony of co-defendant Amy Hoover and jailhouse informant Tyrone Tanks was known to be perjured, yet elicited by the prosecutor and relied on in closing argument (Petition, Doc. No. 1, PageID 12).

**Procedural Default as to Tyrone Tanks**

The Warden asserts this Ground for Relief is procedurally defaulted as to any claim of perjury by Tyrone Tanks because no such claim was presented to the Ohio courts (Return of Writ, Doc. No. 13, PageID 199). Ojile responds that his claim as to Tanks was first presented in post-conviction and had to be presented there because it depended on Tanks' "Deposition" which was not part of the record on direct appeal (Response, Doc. No. 16, PageID 2573).

Ojile raised this claim, including the claim that Tanks perjured himself, as Ground Four in his post-conviction petition (Return of Writ, Doc. No. 13-2, PageID 676-78). Judge Allen rejected the whole petition without an evidentiary hearing, finding that the claims were barred by *res judicata* because they either were raised or could have been raised on direct appeal (Findings of Fact and Conclusions of Law entered August 22, 2012, copy at Return of Writ, Doc. No. 13-2, PageID 876). The First District affirmed denial of the Fourth Ground for Relief on this *res judicata* basis. *State v. Ojile*, Case No. C-120601 (1st Dist. June 12, 2013)(unreported, copy at Return of Writ, Doc. No. 13-2, PageID 844.)

The Magistrate Judge concludes the claim as to any perjury by Tyrone Tanks is procedurally defaulted by Ojile's failure to raise it on direct appeal. The evidence dehors the record he relies on – Tanks' proffered testimony – was available to be included in the record on direct appeal and therefore this claim could have been raised on direct appeal, but was not. In refusing to hear it in post-conviction, the Ohio courts were enforcing their *res judicata*

procedural rule which the Sixth Circuit has repeatedly held is an adequate and independent state ground of decision. See *Durr v. Mitchell*, 487 F.3d 423, 432 (6th Cir. 2007), and other cases cited *supra* at Ground Two, First Sub-claim.

### Merits of the Amy Hoover Claim

The Warden defends on the merits Ojile's claim that the State knowingly used Amy Hoover's perjured testimony. This claim was presented on direct appeal and the First District decided it as follows:

### VIII. Perjured Testimony

[P79] In his ninth assignment of error, Ojile contends that the state denied him a fair trial through the use of perjured testimony. He contends that Hoover lied about Ojile's participation in the first robbery of Weisbrod. This assignment of error is not well taken.

[P80] "The state may neither suborn perjury, nor introduce testimony it knows or should know is false without correcting it." (Citations omitted.) *State v. Sanders*, 92 Ohio St.3d 245, 271, 2001 Ohio 189, 750 N.E.2d 90 (2001). A conviction obtained by the knowing use of perjured testimony is fundamentally unfair and must be set aside if any reasonable likelihood exits [sic] that the false testimony could have affected the jury's judgment. *Kyles v. Whitley*, 514 U.S. 419, 433, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995); *State v. Klein*, 1st Dist. Nos. C-040176 and C-040224, 2005 Ohio 1761, ¶ 35.

[P81] Nothing in the record shows that Hoover's testimony was false or that the state knew or reasonably should have known that it was false. Ojile argues that Hoover lied because she testified that both Ojile and Erkins were with her the first time that Weisbrod was robbed. Ojile points to Weisbrod's testimony that he was robbed by one male and one female. But Weisbrod also testified that the first robbery occurred in complete darkness and that he could not identify his attackers in the dark. The trier of fact could reasonably have found that he was mistaken about the number of attackers.

**[P82]** Ojile also contends that the state knew that he had an alibi for that robbery and for some of the others. He presented evidence showing that he had purchased tickets on flight out of Ohio on the day in question. But Ojile did not present any evidence that he was actually on the flight. To the contrary, Tanks testified that Ojile had told him that he was going to use the plane tickets to create a false alibi.

**[P83]** Additionally, both Ojile's and Erkins's counsel thoroughly cross-examined Hoover. Ojile is simply attacking Hoover's credibility. But matters as to the credibility of evidence were for the trier of fact to decide. *Bryan*, 101 Ohio St.3d 272, 2004 Ohio 971, 804 N.E.2d 433, at ¶ 116. Consequently, we overrule Ojile's ninth assignment of error.

*State v. Ojile*, 2012-Ohio-6015, 2012 Ohio App. LEXIS 5223 (1st Dist. Dec. 21, 2012).

The "deliberate deception of a court and jurors by the presentation of known false evidence is incompatible with the rudimentary demands of justice." *Workman v. Bell,* 178 F.3d 759, 766 (6th Cir. 1998), *quoting Giglio v. United States*, 405 U.S. 150, 153 (1972). This rule applies to both the solicitation of false testimony and the knowing acquiescence in false testimony. *Workman,* 178 F.3d at 766, *citing Napue v. Illinois*, 360 U.S. 264, 269 (1959). However, to prevail on such a claim, a petitioner must show that the statement in question was false, that the prosecution knew it was false, and that it was material. *Wogenstahl v. Mitchell*, 668 F.3d 307, 323 (6th Cir. 2012), *citing Rosencrantz v. Lafler*, 568 F.3d 577, 583-84 (6th Cir. 2009); *Brooks v. Tennessee*, 626 F.3d 878, 894-95 (6th Cir. 2010); *Byrd v. Collins*, 209 F.3d 486 (6th Cir. 2000), *citing United States v. Lochmondy,* 890 F.2d 817, 822 (6th Cir. 1989); *United States v. O'Dell*, 805 F.2d 637, 641 (6th Cir. 1986). The statement must be indisputably false, rather than simply misleading. *Lochmondy*, 890 F.2d at 823; *Byrd*, 209 F.3d at 517. The Ohio case law cited and relied on by the First District is completely consistent with the federal law cited here, particularly the Supreme Court precedent.

Because the Ohio courts decided this claim on the merits, Ojile can prevail only if he can show their decision was an unreasonable application of the clearly established federal law.  This he has failed to do.

To prove Hoover was lying when she testified that Ojile participated in the first robbery of Michael Weisbrod (Count 3 of Case No. B-1006797), Ojile relies on the conflict between that testimony and Weisbrod's testimony that only one male and one female participated and Detective Moy's testimony to the same effect[5] (Response, Doc. No. 16, PageID 2571-72).  There is no proven perjury there.  What Ojile has shown is that there was contradictory testimony presented on that point.  It is certainly the case that it cannot both be true that two persons committed the robbery and three persons committed the robbery.  But the fact that different witnesses had different perceptions and/or recollections does not prove that one of them is lying.  The obligation of a prosecutor not to present perjured testimony does not mean he or she cannot present witnesses who offer contradictory testimony on a particular point.  Any lawyer or judge who has tried a number of cases knows that it is frequently the case that witnesses differ on even key points.  But an attorney must take the witnesses as they come, with all the imperfections and contradictions in their testimony. This point underscores the First District's analysis that Ojile is just attacking Hoover's credibility.

Ojile also relies on his alibi of having been on a plane at the time of this robbery.  But as the First District pointed out in rejecting the ineffective assistance of trial counsel claim based on not subpoenaing the records custodian, the fact that Ojile purchased tickets does not prove he used them or was actually on the plane.  Furthermore, the State presented Tanks' testimony that Ojile admitted to him that the tickets were props for a false alibi.  Ojile of course claims Tanks is

---

[5] Moy's testimony is actually irrelevant except to corroborate what Weisbrod told him for his report, since Moy was not a witness to the robbery.

also a perjurer, but he has presented no proof that he did not say what Tanks claims he said.

The Warden asserts that this Court no longer has jurisdiction to decide the claim that the prosecutor submitted perjured testimony on Counts 2 and 3 of Case No. B-1007149 because the State dismissed those charges and Ojile is not in custody on them (Return of Writ, Doc. No. 13, PageID 199).  The Court agrees that it could not adjudicate a claim solely related to the dismissed charges.  However, Ojile argues persuasively that if a prosecutor knows of several items of perjury by a witness, the prosecutor cannot escape the *Napue* doctrine by dismissing some of the charges on which the lying witness testified.  At the very least, the prosecutor would have to advise the jury of the known perjury.

However, as to the two dismissed Counts, Ojile has again not proven that Hoover perjured herself.  What he has shown is that his alibi on those counts – being in jail in Illinois at the time they happened – was sufficiently persuasive that the State offered to dismiss those charges before trial.  He has not proven that Hoover knew he was in jail in Illinois and deliberately perjured herself.  In other words, even though the prosecutor was persuaded by the alibi, we do not know that Amy Hoover was.  In any event, to the extent Ojile's case was hurt by testimony by Hoover about the incidents underlying Counts 2 and 3, it was invited error in the sense the prosecutor offered to dismiss those counts prior to trial.

Ground Five for Relief is in part procedurally defaulted and in part without merit.  It should be dismissed with prejudice.


**Ground Six:  Conviction on Uncharged Offense**


In his Sixth Ground for Relief, Ojile claims he was denied due process when he was

convicted and sentenced (on Count 26 of Case B-1007149) for conspiring to commit aggravated

robbery when for aggravated robbery rather than conspiracy.  Ojile raised this claim on direct

appeal and the First District decided:

> **[P41]**  In his second assignment of error, Ojile contends that the trial court erred by changing its verdicts. He argues that the trial court had originally convicted him of four counts of conspiracy to commit robbery and one count of conspiracy to commit aggravated robbery, offenses for which he was not indicted, and later improperly changed the verdicts to guilty of complicity to robbery. This assignment of error is not well taken.
>
> **[P42]**  The record shows that the trial court incorrectly stated in its original judgment entry that it had convicted Ojile of five counts of conspiracy to commit robbery and one count of conspiracy to commit aggravated robbery, crimes for which he had not been charged. The trial court subsequently realized its mistake, and journalized an entry nunc pro tunc stating that Ojile had been convicted of five counts of complicity to robbery and one count of complicity to aggravated robbery, which were the correct offenses. A charge of complicity can be stated in terms of the complicity statute or in terms of the principal offense, and the defendant is put on notice that he can be convicted as a principal offender or an accomplice. R.C. 2923.03(F); *State v. Alexander*, 1st Dist. No. C-110035, 2012 Ohio 460, ¶ 31.
>
> **[P43]**  Thus, the record shows that the court did not change its verdicts. It simply corrected a clerical error, which is permissible under Crim.R. 36. *State v. Valdez*, 5th Dist. No. 05-CA-00094, 2006 Ohio 3298, ¶ 88-92; *State v. Lattimore*, 1st Dist. No. C-010488, 2002 Ohio 723, 2002 Ohio App. LEXIS 731, *5-6 (Feb. 22, 2002).  Consequently, we overrule Ojile's second assignment of error.

*State v. Ojile*, 2012-Ohio-6015, 2012 Ohio App. LEXIS 5223 (1st Dist. Dec. 21, 2012).

The Warden claims this Ground for Relief is moot, based on the First District's decision

(Return of Writ, Doc. No. 13, PageID 201).  Not so, says Ojile:  the trial court orally announced

a verdict of guilty of conspiracy to commit aggravated robbery, not complicity.

The record shows in Judge Allen's Amended and Corrected Finding after Court Trial that

she found Ojile guilty of complicity to aggravated robbery on Count 26 (Return of Writ, Doc. No. 13-1, PageID 309).  Ojile has offered no clearly established federal law to the effect that such a written correction of an oral misstatement is a violation of the United States Constitution.

Ground Six should be dismissed with prejudice.


**Ground Seven:  Denial of Right to Confrontation**


In his Seventh Ground for Relief, Ojile asserts he was denied his right to confront an adverse witness, Officer Gregory Morgan, the officer who recovered Tien Dao's Social Security card, driver's licenses, and credit card during a search of Ojile's residence.

Ojile raised this claim on direct appeal and the First District decided:

### IX. Right to Confrontation

[P84]  In his tenth assignment of error, Ojile contends that he was denied his Sixth Amendment right to confront the witnesses against him. He argues that evidence found in his residence during the execution of the search warrant was used against him, but that the police officer who found these items did not testify. Therefore, he did not have any opportunity to cross-examine that officer. This assignment of error is not well taken.

[P85]  A defendant's right to confront witnesses may be violated when a witness testifies to matters outside of the witness's personal knowledge. *See State v. Miller*, 42 Ohio St.2d 102, 104-106, 326 N.E.2d 259 (1975); *State v. Steen*, 4th Dist. No. 93CA49, 1994 Ohio App. LEXIS 3256, *17-19 (June 28, 1994); *State v. Savoia*, 76 Ohio App.3d 201, 205-206, 601 N.E.2d 193 (10th Dist.1991). The record shows that Agent William Crock testified at trial. He was a member of the team executing the search warrant. He was personally present when the search warrant was executed and the incriminating evidence was recovered, although he did not recover it himself. Nothing in the record shows that Crock did not personally observe the recovery of the items or that he testified to anything outside of his personal knowledge. *See* Evid.R. 602.

   **[P86]** Further, Ojile had an opportunity to cross-examine Crock regarding his knowledge of the recovered items. *See State v. Adams*, 1st Dist. Nos. C-000388, C-000389 and C-000390, 2001 Ohio App. LEXIS 3737, *13-14 (Aug. 24, 2001). Therefore, the record does not show that Ojile's right to confront the witnesses against him was violated. We overrule his tenth assignment of error.

*State v. Ojile*, 2012-Ohio-6015, 2012 Ohio App. LEXIS 5223 (1st Dist. Dec. 21, 2012).

   Ojile puts his claim succinctly in his Memorandum in Support:

   The state's failure to call Gregory Morgan to the stand at trial constituted a straightforward violation of the Confrontation Clause. This case clearly involved the prosecution electing to introduce the state's allegations that Gregory Morgan recovered certain items from Ojile's girlfriend's residence through the in-court testimony of Bill Crock.

(Doc. No. 5, PageID 90.)   Ojile relies on recent Supreme Court precedent, *Crawford v. Washington,* 541 U.S. 36, 53-54 (2004)(holding that "[t]estimonial statements of witnesses absent from trial have been admitted only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine. . . ."), and *Bullcoming v. New Mexico*, 564 U.S. ___, 131 S. Ct. 2705, 180 L. Ed. 2d 610 (2011)(Confrontation Clause prohibits admission of certificate of absent lab analyst of results of blood test unless analyst was subject to cross-examination before trial).

   The Warden defends this claim on the merits, agreeing with the First District that there was no violation of the Confrontation Clause (Return of Writ, Doc. No. 13, PageID 202-06). Ojile responds that there was such a violation because the State introduced in evidence testimonial statements of Officer Morgan.

   The Confrontation Clause does not require the State to produce at trial anyone who is a potential witness, i.e., anyone who could give testimony.  Instead, the Constitution requires that

anyone whose testimony is admitted must be presented for cross-examination.

It is clear that the content of what was found is not testimonial. A Social Security card and a state-issued driver's license are self-authenticating public documents admissible in evidence under Ohio R. Evid. 902; the same is probably true of credit cards. By themselves, however, the documents prove nothing. They key is where they were found. In this case, they were personal documents of one of the robbery victims found in a residence associated with Ojile,[6] which is what makes them probative of the crime. The officer who found them would obviously be competent to testify where he found them under Ohio R. Evid. 602; that apparently was Officer Morgan. But the fact that Morgan was competent does not mean no one else was.

The First District found Officer Crock was also competent because "he was personally present when the search warrant was executed and the incriminating evidence was recovered, although he did not recover it himself. Nothing in the record shows that Crock did not personally observe the recovery of the items or that he testified to anything beyond his personal knowledge. See Evid. R. 602." *Ojile, supra*, at ¶ 85.

Ojile claims this was an unreasonable determination of the facts based on the evidence presented and refers the Court to Crock's testimony which begins at Trial Transcript attached at Return of Writ, Doc. No. 13-12, PageID 1433. Crock testified that he had been an agent with the Hamilton County Regional Narcotics Unit for eleven years and with the Sheriff's Office for twenty. *Id.* at PageID 1434. He was assigned to be one of the searchers at Ojile's house at 7238 Creekview on October 6-7, 2010. *Id.* ( Initially he was assigned to watch Agent Ingram at the Hollywood Casino as Ingram was working undercover on the investigation of this case.) The search warrant for the residence was not executed until after Ojile was arrested. *Id.* at PageID 1438. He testified he was present when certain property was recovered. *Id.* at PageID 1439.

---

[6] Ojile refers to its as his girlfriend's residence; the First District refers to it as Ojile's residence.

After identifying a handgun and some ammunition, Crock identified State's Exhibit No. 8 which consisted of two California driver's licenses, a Visa card issued by Bank of America, and a Social Security card, all bearing the name of Tien Dao.  *Id.*  at PageID 1441-42.  These items were found on top of a kitchen cabinet. *Id.*  at PageID 1442.

On cross-examination by Ojile's attorney, Agent Crock testified he arrived at 7238 Creekview at about 5:00 A.M.  He testified that the inventory left at the residence was prepared by Bernie Irwin.  *Id.*  at PageID 1449.  Mr. Cohen asked him about what was on the inventory in terms of who was present and what was found.  *Id.*  at PageID 1451-52.  Sergeant Morgan was present and Crock affirmed Cohen's reading that Morgan found something on top of a kitchen cabinet.  *Id.*  at PageID 1452.  Crock did not find Dao's paperwork but was present when it was found.  *Id.*  at PageID 1454.

This testimony supports the conclusion of the First District.  Gibson, the prosecutor, did not elicit any testimony from Crock about what was on the inventory.  Instead, it was Cohen, Ojile's attorney, who cross-examined from the inventory sheet.  From Crock's testimony, it was Irwin, not Morgan, who created the list.  In any event, Crock testifies he was present when it was found and that testimony is undisturbed on cross.  It is only Ojile's speculation that Crock did not see the evidence recovered because he was assigned another room to search.  In any event, no statement of Morgan was introduced by the State.

Where there is no testimonial statement of an absent witness introduced in evidence, there is no violation of the Confrontation Clause.  The First District's decision is not an unreasonable application of Crawford v. Washington, supra.  Therefore the Seventh Ground for Relief should be dismissed with prejudice.

**Ground Eight:  Deprivation of Right to Counsel by Placement of Informant**

In his Eighth Ground for Relief, Ojile claims he was deprived of his Sixth Amendment right to counsel when the State intentionally placed him in the same cell as Tyrone Tanks and instructed Tanks to elicit damaging admissions.

Ojile asserts he raised this claim in both his post-conviction petition and his 26(B) Application, but not on direct appeal (Petition, Doc. No. 1, PageID 15).  The Warden asserts this claim is procedurally defaulted because it was not raised on direct appeal (Return of Writ, Doc. No. 13, PageID 188).  In fourteen pages of argument on this Ground for Relief (Response, Doc. No. 16, PageID 2585-98), Ojile devotes only the following on this point:  "[T]here has been no procedural default as the state appellate court never asserted any procedural default on this claim." *Id.*  at PageID 2585.

Ojile's argument misses the point of the First District's decision affirming denial of his post-conviction petition.  This is one of the claims that the trial court found barred by *res judicata* and the First District affirmed that conclusion.  *State v. Ojile*, Case No.  C-120601 (1st Dist. Jun. 12, 2013)(unreported, copy at Return of Writ, Doc. No. 13-2, PageID 844.)  This is clearly a claim that could have been raised on direct appeal and was not.  As noted above, the Sixth Circuit has repeatedly held that Ohio's criminal *res judicata*  doctrine is an adequate and independent state ground of decision.

The Eighth Ground for Relief should therefore be dismissed with prejudice.

**Ground Nine:  Denial of Right to Speedy Trial**

In his Ninth Ground for Relief, Ojile claims his right to a speedy trial under the Sixth Amendment was violated by the pre-trial continuance granted by the trial judge.  He asserts Judge Allen granted a fifty-five day continuance to rule on a motion, but nothing in the record indicates the time was being used to decide a motion (Petition, Doc. No. 1, PageID 16). Ojile claims he first raised this claim in his 26(B) Application.  *Id.*

As with Ground Eight, Ojile spends a great deal of space arguing the merits of this Ground for Relief and no space at all responding to the procedural default claim (Response, Doc. No. 16, PageID 2602-14).

Because the facts necessary to establish this Ground for Relief were available on direct appeal but the claim was not raised, it is procedurally defaulted unless Ojile produces excusing cause and prejudice.  In his 26(B) Application, he did make a claim that omitting this as an assignment of error was ineffective assistance of appellate counsel, but for the reasons given above the First District's denial of that claim is entitled to AEDPA deference.  Essentially, that is because Ojile was very unlikely to prevail on a federal claim of lack of speedy trial because his trial was well within one year of his arrest.  See *Barker v. Wingo,* 407 U.S. 514, 530-32 (1972).

Ground Nine should be dismissed with prejudice as procedurally defaulted.


**Ground Ten:  Ineffective Assistance of Appellate Counsel**


In his Tenth Ground for Relief, Ojile asserts he received ineffective assistance of appellate counsel because appellate counsel failed to plead assignments of error raising Grounds One, Two(A), Four, Eight, and Nine (Petition, Doc. No. 1, PageID 17).  Ojile's pleading of this Ground is cursory – he merely asserts that there is a reasonable probability the result of the

appeal would have been different if these claims had been raised (Memorandum in Support of Petition, Doc. No. 5, PageID 100).

The Warden defends this Ground for Relief on the merits (Return of Writ, Doc. No. 13, PageID 208-10). Ojile responds by essentially repeating what was said in his Memorandum in Support.

For the reasons already given, the First District's decision is entitled to AEDPA deference. Ojile has not shown, or even attempted to show in this Court, how any of the omitted assignments of error was stronger than any of the assignments actually raised. The Tenth Ground for Relief should therefore be dismissed on the merits.


**Conclusion**


Ojile's Petition is without merit and should be dismissed with prejudice.

Because of the length of the pleadings in this case (160 pages for the Memorandum in Support and Response) and the fact that the parties have not explicitly addressed the question, the Magistrate Judge makes no recommendation at this point on whether a certificate of appealability should issue on any of Ojile's claims. If Ojile files objections to this Report, he is ordered to include any argument he wishes the Court to consider on a certificate of appealability.

All further filings in this case by either party must comply with the Magistrate Judge's Standing Order[7] requiring all record references to include the Page Identification Number. The Order is available on Non-complying filings will be stricken.

---

[7] The Standing Orders of each Judge of this Court are available by link from that Judge's page on the Court's internet website, www.ohsd.uscourts.gov.

December 2, 2014.

s/ *Michael R. Merz*
United States Magistrate Judge

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within fourteen days after being served with this Report and Recommendations. Pursuant to Fed. R. Civ. P. 6(d), this period is extended to seventeen days because this Report is being served by one of the methods of service listed in Fed. R. Civ. P. 5(b)(2)(C), (D), (E), or (F). Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendations are based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within fourteen days after being served with a copy thereof.  Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See United States v. Walters*, 638 F.2d 947, 949-50 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140, 153-55 (1985).